**Opinion filed May 31, 2016**



In The

# Eleventh Court of Appeals

_____

## No. 11-14-00099-CR

_____

## TONY DEAN McCOY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 39th District Court**

**Stonewall County, Texas**

**Trial Court Cause No. 1772**

## M E M O R A N D U M   O P I N I O N

Following completion of postconviction DNA testing requested by Tony Dean McCoy, the District Court of Stonewall County conducted a hearing pursuant to Article 64.04 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 64.04 (West Supp. 2015). The court concluded that the test results did not

create a probability of innocence sufficient to undermine confidence in the outcome of Appellant's jury trial in 1999. Appellant has appealed.[1] We affirm.

In 1999, a Stonewall County jury convicted Appellant of aggravated sexual assault of a child and assessed his punishment at confinement for twenty years and one day. This court affirmed his conviction on October 12, 2000. *McCoy v. State*, No. 11-99-00049-CR, 2000 WL 34234870 (Tex. App.—Eastland Oct. 12, 2000, no pet.) (not designated for publication). In that appeal, Appellant presented seven issues, including two issues challenging both the legal and factual sufficiency of the evidence. This court discussed the evidence in detail in that opinion, finding it legally and factually sufficient to support his conviction.

In 2011, Appellant filed a postconviction motion for forensic DNA testing of three pubic hairs recovered from the victim's bed covering. Four pubic hairs were found on the bed covering, but only one of the hairs was responsive to DNA testing at the time of trial. The DNA test showed that one pubic hair belonged to someone other than Appellant or the victim. In his motion, Appellant also sought to test blood, saliva, and pubic hair samples from five named individuals that he claimed had access to the victim. The trial court denied the motion on the ground that Appellant had failed to establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing.

In 2013, this court reversed the trial court and remanded the case for further DNA testing. *McCoy v. State*, No. 11-11-00179-CR, 2013 WL 2406550 (Tex. App. —Eastland May 30, 2013, no pet.) (mem. op., not designated for publication). At the hearing on his motion for postconviction DNA testing, Appellant argued that short tandem repeat DNA testing (STR) had been developed as a forensic DNA testing technique subsequent to his trial. Appellant said that the people named in his

---

[1]A court of appeals has jurisdiction to consider a defendant's appeal of unfavorable findings from the Article 64.04 hearing. *Whitfield v. State*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014).

motion as possible suspects were "in and out of that house at the time of that incident" and were not just chosen at random. He theorized that the pubic hairs that could not be tested in 1999 might be tied to one of those individuals. Appellant argued that, if the DNA test showed that one of those people had lost a pubic hair in the victim's bed, where they had no reason to be, and if that evidence had been presented to the jury, he would not have been convicted.

In reversing the trial court, we pointed out that Appellant's request for DNA samples from individuals named in his motion was not addressed at the hearing on his postconviction motion, and we did not address that request. Nor is that motion before us now. The postconviction testing in 2014 did exclude Appellant as being the person who left the three pubic hairs.

After the postconviction DNA testing was completed, the trial court held a hearing pursuant to Article 64.04 of the Texas Code of Criminal Procedure. Article 64.04 specifically provides that, "[a]fter examining the results of testing under Article 64.03 and any comparison of a DNA profile under Article 64.035, the convicting court shall hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted." CRIM. PROC. art. 64.04.

The record reflects that the trial court, under a new district judge, reviewed the entire record of the 1999 jury trial; that record included the motion for new trial hearing. The trial court found that, during the trial, the State's DNA analyst testified that the four pubic hairs taken from the victim's blue comforter were visually similar to Appellant's pubic hair samples, that DNA testing of one of the hairs revealed that it was not from Appellant or the victim, and that the other three pubic hairs did not respond to testing. The trial court stated that Appellant's trial attorney introduced the evidence demonstrating that the one pubic hair sample that did respond to DNA

3

testing did not match the pubic hair sample provided by Appellant. Despite this evidence, the jury found Appellant guilty of aggravated sexual assault of a child.

The trial court also noted that the district attorney had mentioned in his opening statement that a chemist from Lubbock would testify that "he examined several items of evidence including blood and hair from the victim and blood and hair from [Appellant]. There was no mention of the pubic hairs being visually similar to [Appellant]." The trial court also noted that, during closing arguments, the district attorney made no mention of the pubic hairs. The trial court found that, had the results from the postconviction DNA testing been available during the trial in 1999, it is reasonably probable that Appellant would still have been convicted.

In his sole issue on appeal, Appellant argues that the postconviction DNA testing created a reasonable probability of innocence. On appeal, we must determine whether the DNA test results create a probability of innocence sufficient to undermine confidence in the outcome of the trial. In other words, the ultimate question we are to answer is whether Appellant has shown a 51% probability that he would not have been convicted had the results of the ordered DNA tests been available at trial. *Medford v. State*, No. 02-15-00055-CR, 2015 WL 7008030, at *2 (Tex. App.—Fort Worth Nov. 12, 2015, pet. filed) (mem. op., not designated for publication); *Glover v. State*, 445 S.W.3d 858, 861–62 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd); *Cate v. State*, 326 S.W.3d 388, 389 (Tex. App.—Amarillo 2010, pet. ref'd); *Frank v. State*, 190 S.W.3d 136, 138 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd).

Just as the trial court did, we reviewed the entire record, including the record from the underlying trial, to determine if the postconviction DNA test results cast such doubts on Appellant's conviction. We afforded almost total deference to the trial court's determination of issues of historical fact and application-of-law-to-fact issues that turned on credibility and demeanor, and we reviewed de novo other

application-of-law-to-fact issues. *Glover*, 445 S.W.3d at 861; *Cate*, 326 S.W.3d at 389. The ultimate question we must determine is one of law. The Court of Criminal Appeals has concluded "that the courts of appeals have been given authority to consider the sufficiency of the evidence as well as other grounds of appeal" under Chapter 64 by the legislature's enactment of Article 64.05. *Whitfield v. State*, 430 S.W.3d 405, 409 (Tex. Crim. App. 2014); *see also* CRIM. PROC. art. 64.05 (West 2006).

In 2000, we found that the evidence, though circumstantial, was legally and factually sufficient to support Appellant's conviction of aggravated sexual assault of a child. Appellant is the father of the victim, who was thirteen years old at the time of the assault. He also is the father of the victim's older sister, who cared for the victim and was the second witness for the State. The victim suffered from Down's syndrome and from trisomy 21; she was not able to speak and required someone to be with her at all times. The victim and her older sister lived with Appellant, his girlfriend (Paula Tate), and their eight-year-old son.

The older sister and her friend testified that they had asked Appellant if they could go swimming that day. He first refused, but then agreed they could if they took his son with them. After they went to the swimming pool, the two girls wanted one of the older sister's bathing suits. Leaving Appellant's son there, they returned to the mobile home where they had left Appellant and the victim less than an hour earlier. Both girls testified that the door was locked, which was unusual; that it took Appellant five to seven minutes to answer the door despite their loud knocking; that Appellant answered the door wearing only his pants; that they found the victim naked with duct tape on her wrists and ankles and blood on her stomach; that there was a large wet blood spot on the older sister's pink comforter on the top bed of the trundle bed; that the older sister then yelled and Appellant came to where they were in the mobile home; that Appellant wanted the comforter washed immediately in

5

cold water to remove the stain; that they also noticed drops of blood on the blue comforter on the victim's trundle bed; that Appellant blamed the incident on his son; and that the older sister told Tate the next day that she thought her dad had been doing something with the victim and that the victim should be examined at the local hospital.

Tate testified that the older sister was crying when she told Tate the next day what the two girls had found. The older sister told Tate that she thought "Dad's been messing with [the victim]." Before Tate took the victim to the local hospital for an examination, she questioned Appellant about the locked door. Appellant told her that he locked the door because he was "smoking a joint" and was then going to take a shower. Later, Appellant told Tate that he was taking a shower and did not want anyone to come in. At one point, Tate told Appellant that his answers were not making any sense. She left, and when she came back, he said, "I love you Paula. Do you know what will happen to me?" Appellant also said, "I might as well go to the country and shoot myself." Tate testified that, when she asked Appellant where he was when the older sister found the victim in the bathroom, he told her that he was outside.

Because the determination of the veracity of the foregoing evidence was based on credibility and demeanor, we assume, based on the jury's guilty verdict, that the jury believed that these events and statements occurred as the girls and Tate testified. There were two examinations of the victim. A nurse practitioner from the local hospital testified that the victim had a small tear in her labia minora and a small hematoma on her vaginal opening. The nurse practitioner believed that the victim had been sexually assaulted. On July 24, a sexual assault nurse examiner at Hendrick Medical Center found that the victim had suffered chronic penetration that had worn down the wall of the hymen and that penetrations had occurred in the past; she was unable to say that penetration had also occurred on July 22.

Tate testified that, after the victim was examined at the local hospital, she was surprised to find that Appellant had taken her car and left his company pickup for her to drive. She also said that, upon returning to their mobile home, she discovered that Appellant was gone and that he had taken all his clothes and guns with him. Tate also testified that, from July to September, she had no contact with Appellant and did not know where he was. When he called the first time, she was too upset to talk. A week later, he called and said that he was working in Louisiana and would send her money; she told Appellant of the charges against him.

Texas Ranger Marshall Brown testified that Appellant sent money to Tate but that Appellant had a man named Timothy Wilson send the money; Ranger Brown opined that that action was to prevent Ranger Brown from being able to locate Appellant. Ranger Brown learned from Sheriff Bill Mullen that the money was wired from someone named Wilson who resided at 7B Nola Street in Dodge City, Kansas. But there was no Nola Street in Dodge City. However, there was a Nola Street in a town near Oklahoma City. The jury could have considered Appellant's flight and actions during his flight to be strong evidence of his guilt.

Appellant chose to testify at trial. He confirmed that he locked the door, but said that he did so because he wanted to keep the victim inside and did not want his dog to run off. But on cross-examination, he admitted that he told Paula that he was in the bathroom smoking a joint. As he was about to get into the shower, he heard someone beating on the door. He went to the door, let his older daughter and her friend in, and then went back to shower. It was then that the girls began hollering, and they "come in there carrying this wad of tape." Appellant testified that, when the girls showed him the stained bed covering on the older sister's bed, he told the older sister to wash it because he did not want Tate to find it and get in a fight with her.

7

Appellant testified that, after Tate took the victim to the hospital, he drove around for awhile, changed his company pickup for her car, drank a couple of beers, "went off [his] rocker," and started driving toward Oklahoma. He went to Tahlequah, Oklahoma, where his aunt lived. He admitted that he had a coworker, Wilson, wire the money because he had never wired any money.

During the State's direct examination of the forensic expert, David Young, the State did not question him concerning the testing of the pubic hairs. Appellant's attorney, during cross-examination of Young, first raised the subject of DNA testing of the pubic hairs. It was then that Young stated that pubic hairs are tested if they appear visually similar to the defendant's pubic hairs and that, in this case, the four hairs did. However, only one hair responded to DNA testing, and it was not from the victim or Appellant. In closing argument, Appellant's attorney pointed out that the State had chosen not to introduce into evidence the lab report that had negative results and also pointed out that none of the pubic hairs matched Appellant. In its closing arguments, the State was brief and principally said that the most important witness was Appellant, that Appellant's answers were too perfect, and that Appellant should not be believed.

Appellant's trial attorney offered the jury the theory and argument that Appellant makes now. He argued that the one pubic hair belonged to someone other than the victim or Appellant; yet the jury decided to convict Appellant. The argument now is that none of the pubic hairs on the blue comforter belonged to Appellant. More than just the DNA test results needed to be presented before we can say that Appellant has shown a 51% probability that he would not have been convicted had the results of the ordered DNA tests been available at trial.

The DNA evidence by itself is inconclusive. Appellant offered no evidence to reasonably explain the condition in which the other children found the victim or how, if he was in the house at the time the other children came home, he did not

8

know that the victim was bound with tape in the bathroom with blood on her stomach. In addition, Young did not testify that the hairs belonged to Appellant based on the fact that they were visually similar to Appellant's known sample. Instead, Young explained that analysts where he works do a visual comparison and that, if they think the pubic hairs "could have possibly come from an individual[,] we will go ahead and run it using our DNA analysis." Young testified that he could definitively conclude that one of the pubic hairs did not come from Appellant and that he could not definitively say who the other pubic hairs came from. Therefore, the DNA evidence does touch upon a defense presented to and apparently rejected by the jury that convicted Appellant. *See Cate*, 326 S.W.3d at 390. Consequently, we overrule Appellant's sole issue on appeal.

We uphold the finding of the trial court and affirm its order.

PER CURIAM

May 31, 2016

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and McCall.[2]

Bailey, J., not participating.

---

[2]Terry McCall, Retired Justice, Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.